Argued and submitted June 11, 2009, decision of Court of Appeals and judgment of circuit court affirmed March 4, 2010

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LUIS ARMANDO MEJIA,
*Petitioner on Review.*

(CC 0401-30443; CA A128080; SC S056560)

227 P3d 1139

Laura A. Frikert, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Stacey RJ Guise, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

GILLETTE, J.

## GILLETTE, J.

The issue in this criminal case is whether the evidence was sufficient to permit a trier of fact to find defendant guilty of kidnapping in the second degree. The trial court determined that that evidence was sufficient and denied defendant's motion for a judgment of acquittal. Defendant appealed, and the Court of Appeals affirmed without opinion. *State v. Mejia*, 218 Or App 736, 180 P3d 763 (2008). We allowed defendant's petition for review and now affirm the decision of the Court of Appeals and the judgment of the trial court.

Because defendant appeals from the trial court's denial of his motion for a judgment of acquittal, we state the facts of the case in the light most favorable to the state. *See State v. Casey*, 346 Or 54, 56, 203 P3d 202 (2009) (restating that rule). In 1999, defendant and the victim met in Las Vegas, where they began a romantic relationship and had a child together. Later, after the relationship soured, the victim moved to Portland with the child. The victim remained in touch with defendant, but the couple continued to have problems with their relationship. Eventually, the victim obtained a restraining order against defendant.

On the evening of November 20, 2003, while the restraining order was still in effect, the victim put her daughter to bed at her brother's house and went to her own apartment to change clothes, intending to go out to a movie. After taking a bath and changing her clothes, the victim opened the door to her apartment to leave. As she started out her doorway, with "probably * * * one foot out," defendant—who apparently had been lurking outside—grabbed her and pushed her back inside the apartment.

Defendant forced the victim into the apartment's living room. The victim struggled with defendant and told him to leave, but defendant kept insisting, "I want to talk to you." The victim attempted to call for help on her cell phone, but defendant grabbed the phone and put it in his pocket. Defendant then forced the victim down the hallway of the apartment, toward her bedroom. The victim became aware that defendant was, as she phrased it, "trying to seclude" her, and she began screaming for help. Defendant put his hand over

the victim's mouth. The victim continued to struggle, kicking and biting defendant. Defendant pushed the victim into the bedroom. Police officers later estimated that the distance from the front door to the area in front of the victim's bedroom was about 12 feet, and the distance from that point to the back of the bedroom was another 17 feet.

Once in the bedroom, defendant forced the victim up against a dresser, saying, "If I can't have you, nobody will." He took out a handgun and pointed it at the victim's upper body and head, telling her, "I'll kill myself and I'll kill you. I have nothing to live for." The victim, terrified and crying, attempted to reason with defendant, saying that he was going to leave their daughter without a mother. Defendant began to relax his hold on the victim and, at that point, the victim made a dash for the bedroom window in an attempt to escape. Defendant grabbed the victim by the legs, causing the victim to fall on the bed, which was against the back wall of the bedroom. The victim continued to kick and struggle, and defendant "smashed" a comforter into the victim's face, making it difficult for her to breathe. Defendant then pinned the victim to the floor, straddling her, and began choking her with both hands, saying that he would kill her. As the victim would begin to lose consciousness, defendant would ease his grip on her and allow her to breathe; the victim would then attempt to get up and away from defendant, at which point defendant would begin choking her again. That pattern repeated itself several times over the next few minutes.

Eventually, the victim stopped struggling and began talking to defendant, telling him that she "wanted to work it out" with him, and other "things I know that he's always been wanting to hear." The victim told defendant that she loved him and that she would not call the police; defendant indicated that if she did, he would shoot her and the police. The victim agreed to meet with defendant in the morning, and defendant slowly let her get to her feet. Defendant wiped some blood off of the victim's face with toilet paper, helped her put her coat on, and walked her to her car. After stating that he would call the victim the next morning, defendant returned the victim's cell phone to her and left. The victim

drove to her brother's house and told him what had happened. The brother called the police. By the victim's estimation, the episode with defendant had lasted "an hour and a half, at least."

The state charged defendant with two counts of first-degree kidnapping; one count each of first-degree burglary, unlawful use of a weapon, and menacing; and five counts of fourth-degree assault. Both kidnapping charges alleged that defendant "did unlawfully and knowingly, without consent or legal authority, take [the victim] from one place to another, with intent to interfere substantially with the said [victim's] personal liberty * * *." At the close of the state's case during defendant's jury trial, defendant moved for a judgment of acquittal, arguing, with respect to the kidnapping charges, that a reasonable trier of fact could not find that defendant moved the victim from one place to another, or that he had intended to interfere substantially with her personal liberty. Instead, defendant argued, any movement of the victim was "incidental" to his assault of her. The trial court denied the motion. The jury convicted defendant of the lesser-included offense of second-degree kidnapping (both counts), burglary, menacing, and assault (three counts).

Defendant appealed the denial of his motion for a judgment of acquittal on the kidnapping charges, arguing, *inter alia*, that his "minimal movement of the victim" was insufficient, as a matter of law, to prove an "intent to interfere substantially with [the victim's] personal liberty." ORS 163.225(1).[1] Specifically, defendant framed the issue before the Court of Appeals in terms of

> "whether movement from one area of an apartment, to another area in the same apartment, during the course of threats and assaults, evidenced an intent on defendant's part to interfere substantially with [the victim's] personal liberty, or whether the movement was merely incidental to the commission of the assaults."

Defendant did not renew in the Court of Appeals his argument to the trial court that there was insufficient evidence

---

[1] Defendant does not challenge his convictions for burglary, assault, and menacing.

that he had moved the victim "from one place to another." The Court of Appeals affirmed defendant's convictions without opinion, and we granted review.

■      When this court reviews the denial of a motion for a judgment of acquittal, the relevant question is "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). Kidnapping in the second degree is defined by ORS 163.225, which provides, in part:

"(1)   A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a)   Takes the person from one place to another; or

"(b)   Secretly confines the person in a place where the person is not likely to be found."

The state charged defendant with kidnapping the victim by taking her from one place to another, *i.e.*, kidnapping under ORS 163.225(1)(a). Accordingly, the state had to establish that defendant, (1) with intent to interfere substantially with [her] personal liberty, (2) took the victim from one place to another (3) without consent or legal authority. *See State v. Walch*, 346 Or 463, 468, 213 P3d 1201 (2009) (listing essential elements of kidnapping).

The dispute on review centers on the first of those elements, *viz.*, whether there was evidence of defendant's intent to interfere substantially with the victim's personal liberty.[2] Defendant argues that the state was required to prove that intent by proving that he either moved or intended to move the victim a "substantial distance." Defendant asserts that his movement of the victim—a total distance of no more than 29 feet, primarily (if not exclusively) within her

---

[2] Before this court, defendant also asserts, in a cursory fashion, that there was not sufficient evidence to establish that he took the victim from one place to another. However, defendant concedes that he did not raise that argument before the Court of Appeals. It therefore is not properly before this court, and we do not address it.

own home—is insufficient to establish an intent to move the victim a substantial distance and, therefore, is insufficient to establish the element of intent to interfere substantially with the victim's liberty. As for his other actions, such as taking the victim's cell phone and preventing her from escaping the apartment, defendant argues that those actions were incidental to his other crimes, such as assault and menacing, and that they also do not evince an intent to move the victim a substantial distance.

The state responds that defendant has misconstrued the intent element of kidnapping. According to the state, it may establish an intent to interfere substantially with the victim's personal liberty by demonstrating "that [defendant] intended *either* to move the victim a substantial distance or to confine the victim for a substantial period of time." (Emphasis the state's.) In effect, the state argues that, regardless of which *act* element is charged in the indictment, it may establish the requisite *intent*—"to interfere substantially with another's personal liberty"—by proving that the defendant intended to take *or* to confine the victim. That argument about the purpose, meaning, and scope of the second-degree kidnapping statute leads us to an examination of the legislative history of that statute.

The legislature adopted the current kidnapping statutes in 1971. Or Laws 1971, ch 743, §§ 97-103. Before that time, kidnapping statutes were broadly drafted. Prosecutors could take advantage of those broad statutes by charging defendants with kidnapping when they had "moved their victims only a short distance or confined their victims for a short duration," often "incidentally to the commission of another crime, such as rape or robbery." *Walch*, 346 Or at 470.[3]

To avoid the potential for such a broad application, the legislature sought to draft the current version of the kidnapping statutes more narrowly. As this court has described it, the legislative purpose was to avoid any use of kidnapping as a substitute for some other crime. *State v. Garcia*, 288 Or

---

[3] As *Walch* notes, the commentary to the 1971 statute does not specify "whether the drafters believed that that specific problem existed in Oregon under the pre-1971 Oregon statute." 346 Or at 470 n 5.

413, 416-20, 605 P2d 671 (1980). In *Garcia*, this court studied the history of those statutes and determined that the legislative intent was that "there be no conviction of the defendant for the separate crime of kidnapping *where the detention or asportation of the victim is merely incidental to the accomplishment of another crime * * *.*" *Id*. at 420 (emphasis added). Rather, the legislature reserved the prosecution and punishment of kidnapping for situations "where the detention or asportation is not merely incidental to the commission of the underlying crime." *Id*. (emphasis omitted). The intent element of kidnapping was the legislature's means to achieve that goal. *Walch*, 346 Or at 473 (noting that "[t]he drafters' wording of the intent element * * * makes it apparent that it was through *that* element that they sought to avoid an over-inclusive definition of second-degree kidnapping" (emphasis in original)). In other words, the legislature adopted the requirement that a defendant intend to substantially interfere with a victim's personal liberty in order " 'to distinguish kidnapping from incidental conduct that might accompany some other crime.' " *State v. Wolleat*, 338 Or 469, 477, 111 P3d 1131 (2005) (quoting Minutes, Criminal Law Revision Commission, June 17, 1969, 20).

■　　In *Wolleat*, this court, after again reviewing the legislative history of the kidnapping statute, provided a further explanation of what the legislature meant when it enacted the requirement that a defendant must intend to interfere substantially with a victim's personal liberty:

> "The decision in *Garcia* removes some of the ambiguity from the phrase 'intent to interfere substantially with another's personal liberty.' It confirms that the liberty interest that the statute protects from interference is the interest in freedom of movement and concludes that, in order for the interference to be substantial, a defendant must intend either to move the victim a 'substantial distance' or to confine the victim for a 'substantial period of time.' "

338 Or at 475.

Two recent cases provide examples of facts from which a reasonable trier of fact could not infer that the

defendant intended to interfere substantially with the victim's personal liberty. In *Wolleat*, the defendant returned home from a night of drinking and entered the bedroom that he shared with the victim, his fiancée. The defendant grabbed the victim by the hair, pulled her out of bed, dragged her approximately 15 to 20 feet into the living room, and proceeded to assault the victim until she fled the house. This court held that "[m]oving a victim from one room to another while committing another crime does not constitute moving the victim a substantial distance." *Id.* at 478. In other words, that movement was "*not sufficient, by itself*, to give rise to an [inference of an] intent to interfere substantially with the victim's liberty to move freely." *Id.* (emphasis added). Furthermore, the record did not contain any other basis from which a reasonable juror could infer that the defendant had intended either "to move the victim a greater distance" than he had during the assault, or to "transport [the victim] to a place of confinement." *Id.* Therefore, there was no evidence that the defendant had intended to interfere substantially with the victim's personal liberty. Put another way, there was no kidnapping because the defendant's forceful movement of the victim was merely incidental to his commission of an assault and, therefore, was insufficient, standing alone, to establish an intent to interfere substantially with the victim's liberty.

In *State v. Zweigart*, 344 Or 619, 188 P3d 242 (2008), *cert den*, ___ US ___ , 130 S Ct 56, 175 L Ed 2d 45 (2009), the defendant conspired with another individual to stage a robbery at the house that the defendant shared with the victim, and to kill the victim during the staged robbery. As planned, the co-conspirator entered the house, roused the victim and the defendant from their bed, and led them downstairs at gunpoint. While the co-conspirator held the victim at gunpoint downstairs, the defendant rounded up guns and money from the house to give to his co-conspirator. The victim was then shot and killed. This court held that the movements of the victim "were incidental to the robbery and shooting" and, therefore, were insufficient, standing alone, to establish intent to interfere substantially with the victim's liberty:

> "[M]inimal movement that amounts to incidental conduct that might accompany some other crime is, standing alone, insufficient proof of intent to support a conviction."

*Id.* at 636 (citing *Wolleat*, 338 Or at 478).

■■ Not surprisingly, defendant relies on *Wolleat* and *Zweigart* here. But both *Wolleat* and *Zweigart* involved situations in which the actual physical movement of the victims was the only evidence available to prove whether the defendants intended to kidnap the victims by substantially interfering with their personal liberty. Those cases demonstrate that, when the only evidence of a defendant's intent is physical movement of the victim, a reasonable juror may only infer intent to interfere substantially with a victim's freedom of movement if there is "evidence that the defendant moved the victim a *substantial* distance." *Zweigart*, 344 Or at 636 (emphasis added). Consequently, if the defendant did not move the victim a substantial distance, and there is no other evidence from which a trier of fact may infer an intent to interfere substantially with the victim's personal liberty, then the evidence will not support a conviction for kidnapping.[4]

■ This is not a case in which there was no other evidence, however. As the court stated in *Garcia*:

> "As finally enacted the [kidnapping] law does not even require that there actually be a substantial interference with the victim's personal liberty; it is only necessary that the perpetrator have the '*intent* to interfere substantially' with the victim's personal liberty to make the malefactor guilty of kidnapping if he commits an act proscribed by ORS 163.225."

288 Or at 421 (emphasis in original). The state points to evidence, albeit circumstantial, in the record before this court

---

[4] We reemphasize, as we did in *Walch*, that it is not necessary to prove that a defendant actually moved the victim over a "substantial distance" in order to prove the *act* element of a kidnapping by asportation—*i.e.*, to prove that the defendant took the victim "from one place to another," as required by ORS 163.225(1)(a). *Walch*, 346 Or at 476 n 7 (noting that this court's cases "do not state * * * that 'substantial movement' is the only way to prove that a defendant moved a victim from one place to another").

that the state asserts distinguishes this case from *Wolleat* and *Zweigart*. We turn to that argument.

■    The state contends that, when it charges a defendant with kidnapping by taking the victim from one place to another, it may establish the defendant's intent to interfere substantially with the victim's personal liberty by, *inter alia,* demonstrating that a defendant intended to confine a victim for a substantial period of time when she wished to leave. In so arguing, the state relies on this court's statement in *Wolleat* that

> "in order for the interference [with a victim's personal liberty] to be substantial, a defendant must intend either to move the victim a 'substantial distance' or to confine the victim for a 'substantial period of time.'"

338 Or at 475.

Defendant responds that to permit the state to prove the defendant's state of mind in that way would allow the state to prove a violation of ORS 163.225(1)(*a*) (taking a person from one place to another) by proving what was, in fact, a violation of ORS 163.225(1)(*b*) (secretly confining a person in a place where she is unlikely to be found). As we shall explain, however, the state's argument is not quite what defendant claims it to be. In this case, the state urges, there was evidence that defendant intended to confine the victim in her apartment for a substantial period of time—an act which, if carried out, certainly would "interfere substantially" with the victim's personal liberty. The state specifically points to the evidence that defendant reversed the victim's direction of movement, took the victim's cell phone, covered the victim's mouth to silence her, and prevented the victim from escaping by pulling her away from the window. The state contends that, from this evidence, a reasonable trier of fact "could infer that defendant had the separate intent to keep the victim in her apartment and hold her captive." Accordingly, the state argues, the evidence supports a finding of intent to interfere with the victim's personal liberty.

We agree with the state. In our view, the requisite intent, *viz.,* the "intent to interfere substantially with another's personal liberty," may be shown in at least those

two ways, and possibly in others. The fact that the method of proof of that intent here resembles the alternative definition of the act of kidnapping, *viz.*, "[s]ecretly confining [a] person in a place where the person is not likely to be found," ORS 163.225(1)(b), is no impediment; such evidence is probative of defendant's state of mind, and it was permissible for the trier of fact to use it in that way.[5]

Applying the foregoing holding to the facts, there is evidence from which the trier of fact could have found that defendant's acts were more than just incidental to his acts of menacing and assaulting the victim. Defendant moved the victim from her front doorway into her bedroom, took away her cell phone, stifled her screams, physically restrained her, pinned her down and choked her when she attempted to escape, all with the plausible intent to interfere with her liberty. In fact, he *did* interfere with the victim's liberty: He kept the victim confined for about an hour and a half. Such evidence would be sufficient to allow a reasonable trier of fact to find that, apart from his various assaultive and menacing acts, defendant intended to interfere substantially with the victim's personal liberty. The trial court did not err in denying defendant's motion for judgment of acquittal on the kidnapping charges.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[5] We say "resemble" because, although the evidence shows that defendant *confined* the victim, the evidence did not permit the inference that the locale of the confinement—the victim's own apartment—was a place where the victim "[was] not likely to be found."